**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| S., <u>et al.</u> | : | |
| | : | **CIVIL ACTION** |
| v. | : | **NO. 05-1284** |
| | : | |
| **THE WISSAHICKON SCHOOL** | : | |
| **DISTRICT** | : | |

<u>**MEMORANDUM AND ORDER**</u>

**Kauffman, J.**                                                                              **July 24, 2008**

Plaintiffs Enrico and Patricia S. ("Plaintiffs" or "Parents") bring this action on behalf of their son Richard S. ("Richard") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, <u>et seq.</u> ("IDEA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; and Section 1983 of the Civil Rights Act of 1964 ("Section 1983").  They contend that Defendant the Wissahickon School District ("Defendant" or "the District") failed to properly identify Richard as a student with disabilities and failed to conduct appropriate educational evaluations and plans for Richard, thereby denying him a "free, appropriate public education" (FAPE).

Plaintiffs seek reversal of the Special Education Appeals Panel's decision denying them compensation for the 2002-2004 period, along with an award of compensatory damages and reasonable attorney's fees.  The District seeks reversal of the Special Education Appeals Panel's decision granting Plaintiffs compensatory education for the 1999-2001 period.  Now before the Court are: (1) Plaintiffs' Motion for Judgment on the Administrative Record, and (2) Defendant's Motion for Judgment on the Administrative Record and for Summary Judgment.  For the reasons

1

that follow, Defendant's Motion will be granted, and Plaintiffs' Motion will be denied.

## I.   STATUTORY FRAMEWORK

The IDEA requires states receiving federal education funding to ensure that all children who are disabled, regardless of the severity of their disability, and who are in need of special education and related services be identified, located and evaluated.  See W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995).  The "so-called 'child-find' duty includes a requirement that children who are suspected of having a qualifying disability must be identified and evaluated within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." O.F. v. Chester Upland Sch. Dist., 246 F. Supp. 2d 409, 417 (E.D. Pa. 2002).  Once a child is identified as having a disability, the IDEA requires the school district to develop an Individualized Education Program ("IEP").  An IEP is "a written statement developed for each child that must include ... the child's current level of performance, and how her disability affects her performance." S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 264 (3d Cir. 2003).  It must also "detail those special education services and supplementary aids that the school will provide, explain how they will contribute toward meeting the annual goals, how they will allow the child to progress in both the general curriculum and participate in extracurricular activities, and describe how the child will interact with disabled and non disabled children." Id.

The Act also specifies how the IEP is to be developed: "An IEP team meets and writes the IEP considering the strengths of the child, the concerns of the parent, and the most recent evaluation of the child." Id.  The IEP team must include the child's parents, at least one special education teacher of the child, a representative of the local educational agency who is qualified to

design a course of instruction for the disabled child, and "at the discretion of the parent or agency, other individuals who have knowledge or special expertise regarding the child." 20 U.S.C. § 1414(d)(1)(B).

Parents who disagree with an IEP are entitled to "an impartial due process hearing." Id. § 1415(f). "Any party aggrieved by the findings and decision" rendered in the due process hearing may "appeal such findings and decision to the State educational agency." Id. § 1415(g). A party wishing to appeal that decision may "bring a civil action ... in any State court of competent jurisdiction or in a district court of the United States." Id. at § 1415(i)(2).

## II.   PROCEDURAL BACKGROUND

Plaintiffs began the administrative process in 2003 by requesting a special education due process hearing to address their complaint that the District failed to offer Richard a FAPE. Administrative hearings were held in May, July, and September 2004. The Hearing Officer, applying the holding in Montour Sch. Dist. v. S.T., 805 A.2d 29 (Pa. 2002), dismissed the claims that arose prior to June 2002, but concluded that the District denied Richard a FAPE between June 2002 and September 2004. He therefore ordered the District to provide conmpensatory education of five hours a day for each school day during that period. The District appealed to the Special Education Appeals Panel (the "Appeals Panel"). On December 16, 2004, the Appeals Panel reversed the award of compensatory education.

In March 2005, Plaintiffs commenced this action seeking review of the administrative decisions. On October 6, 2005, this Court granted Plaintiffs' Motion for Remand and directed the administrative tribunals to consider whether Richard was entitled to compensation without imposition of the limitations period prescribed in Montour. Due process hearings were held in

3

April and May 2005 to address whether the District failed to identify Richard as a student in need of special education and failed to provide a FAPE during the 1999-2000 and 2000-2001 school years.  In a decision dated June 25, 2006, the hearing officer held that Richard was not eligible for special education during the 1999-2001 period and denied Plaintiffs compensatory education. Plaintiffs appealed, and on August 11, 2006, the Appeals Panel reversed, holding that Richard should have been identified as eligible for special education and that the District failed to offer him a FAPE during the period at issue.  The Appeals Panel awarded Plaintiffs full compensatory education for each school day Richard attended during the 1999-2000 and 2000-2001 school years.

Plaintiffs filed this action seeking review and reversal of the Appeals Panel's denial of compensatory education from January 2002 to September 2004.  The District has filed a counter-claim seeking review and reversal of the award of compensatory education for the 1999-2000 and 2000-2001 school years.

## III.    FACTUAL BACKGROUND

In 1994, when Richard was in second grade, Plaintiffs suspected that he might have a learning disorder and/or Attention Deficit Hyperactivity Disorder (ADHD) because he experienced difficulties with attention and handwriting and required constant praise and reinforcement.  See Appeals Panel Opinion, Aug. 11, 2006 ("AP 2006"), at 1.  At Plaintiffs' request, the District evaluated Richard and confirmed he had special needs in organization, attention, visual sequencing, tracking, and self-esteem.  Id. at 1, 2.  The District's report noted that a "child psychologist has informed [the parents] that [Richard] is hyperactive and may have ADHD."  Id.  The District ultimately chose not to place Richard in special education because

4

there was no discrepancy between his ability and achievement.  See Appeals Panel Opinion, Dec. 16, 2004 ("AP 2004") at 1.

Richard performed well in the third through sixth grades, and earned A's and B's in regular classes.  See May 11, 2004 Due Process Hearing, at 43, 124-25.  However, in the seventh grade, Richard's progress slowed, and his grades began to decline.  His poor performance continued into the eighth grade, when Richard was frequently absent, failed to complete homework, and received low grades.  See id. at 131-33; AP 2004 at 1.  In April 2001, Plaintiffs requested a multidisciplinary evaluation.

 In November 2001, Richard was evaluated at the Children's Hospital of Philadelphia ("CHOP"), and was diagnosed with ADHD and a math disorder.  See AP 2006 at 2.  On December 17, 2001, when Richard was in the ninth grade, the District issued an Evaluation Report that incorporated the CHOP report's findings of ADHD, inattentive subtype, and a math disability. The report further listed difficulties in the areas of focus, concentration, and motivation for academic work.  See id; May 11, 2004 Due Process Hearing, at 44-56.  On January 17, 2002, the District developed Richard's first Individualized Education Program (IEP), which included a behavioral support plan.  Additional IEPs were developed in March, June, October, and December 2002, as well as in February 2003, and February and April 2004.  In September 2004, Richard withdrew from school.  See Hearing Officer Decision, June 25, 2006 ("2006 hearing Officer Decision"), at 2-5; AP 2004 at 1-3.

## IV.   LEGAL STANDARD

"When deciding an IDEA case, the District Court applies a modified version of de novo review and is required to give due weight to the factual findings of the ALJ."  L.E. v. Ramsey

Bd. of Educ., 435 F.3d 384, 389 (3d Cir. 2006).  Thus, the "[f]actual findings from the administrative proceeding are to be considered prima facie correct.  If a reviewing court fails to adhere to them, it is obliged to explain why.  The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities."  S.H., 336 F.3d at 270.

However, where the conclusions of the hearing officer and Appeals Panel differ, "due weight" to the administrative proceedings generally requires deference to the Appeals Panel unless the Appeals Panel reverses a credibility-based finding of the hearing officer and the panel's decision to reverse is unsupported by non-testimonial, extrinsic evidence or by the record read in its entirety.  Carlisle Area Sch. v. Scott P. By and Through Bess P., 62 F.3d 520, 529 (3d Cir. 1995); Eric H. ex rel. John H. v. Methacton Sch. Dist., 265 F. Supp. 2d 513, 515 (E.D. Pa. 2003).  The burden of persuasion lies with the party seeking relief.  Andrew M. v. Del. County Office of Mental Health and Mental Retardation, 490 F.3d 337, 345 (3d Cir. 2007) (citing Schaffer v. Weast, 546 U.S. 49, 62 (2005)).

In deciding a motion for summary judgment pursuant to Fed. R. Civ. P. 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law."  Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## V.    ANALYSIS

### A.    THE IDEA Claim

1.      *The 1999-2001 School Years*

Due process hearings were held before the Hearing Officer in April and May 2006, to address whether the District failed to identify Richard as a student in need of special education and failed to provide a FAPE during the 1999-2000 and 2000-2001 school years.  After hearing testimony from a number of Richard's seventh and eighth grade school teachers, the school psychologist, a guidance counselor, and former director of special education, the Hearing Officer concluded that there was no evidence in the record supporting Plaintiffs' claim that the District failed to timely identify Richard as a child in need of special education and therefore failed to provide him a FAPE in the 1999-2001 period.  Specifically, the Hearing Officer found that the testimony of the witnesses, many of whom worked directly with Richard, revealed that Richard did not meet the criteria of a "student with a specific learning disability in any area for the period in question."  2006 Hearing Officer Decision, at 11.

With regard to Plaintiffs' allegations that Richard suffered from ADHD and that the District was on notice of this disability as early as 1994, the Hearing Officer found that there was no evidence that Richard had classroom needs relating to ADHD, or that ADHD adversely impacted his academic performance:

> [T]he testimony of the teachers, all with many years of teaching experience, [was] very helpful and credible.  They did not see a student who had problems with attention, impulsivity, or hyperactivity.  The many teachers who testified indicated no problems with attention.  Additionally, the District's evaluation noted that Richard's elementary school record did not confirm the presence of a significant problem, nor did the Parent[s] report any significant problems with attention/impulsivity during Richard's elementary school years.

2006 Hearing Officer Decision, at 12.  Citing the lack of evidence to support a finding of eligibility for special education, the Hearing Officer denied Plaintiffs compensatory education for

7

the 1999-2001 period.  Id. at 15.

Plaintiffs appealed the Hearing Officer's decision to the Appeals Panel.  On August 11,

2006, the Appeals Panel issued an opinion reversing the decision of the Hearing Officer and

granting Plaintiffs compensatory education.  The Appeals Panel found that the District was on

notice that Richard may have ADHD when he was in the second grade, yet failed to identify him

as a disabled child in a timely fashion, thus violating its "child find" obligations.  See Matula, 67

F.3d at 492.  In support of its conclusion, the Appeals Panel noted that "the evidence in the

record is overwhelming that [Richard's] behavior was consistent with the symptoms of Attention

Deficit Disorder when he entered the seventh grade."  AP 2006, at 6.  The Appeals Panel's

opinion, however, consists of conclusory remarks about Richard's condition without reference or

citation to the administrative record.  Moreover, its findings are unsupported by the evidence in

the record and are contrary to the testimony of multiple witnesses who worked directly with

Richard before and during the relevant 1999-2001 period and whom the Hearing officer found to

be highly credible.

The theme that emerged from the testimony of Richard's teachers and other education

professionals who evaluated him is that Richard's inadequate performance during the seventh

and eighth grades stemmed primarily from his frequent absences and failure to complete

homework, and that he performed well on tests and quizzes.  For example, Gail Friel, a school

psychologist who had been involved in evaluating Richard in 1994, testified that Richard

performed very well between the third and sixth grades, and that his behavior and achievement in

the seventh and eighth grade fell within a range of "typical behavior that could be addressed

through the regular education program."  Testimony of Gail Friel, April 17, 2006 Hearing, at

195-96.  When asked why, in light of the 1994 evaluation, Richard was not immediately re-

evaluated when his grades began to decline in the seventh and eighth grades, Friel stated:

> I think at that point that Richie was – his picture was very consistent with a
> youngster who does not have a disability, who not – who, again, has low
> motivation.  In 6th grade ... he had a fairly good 6th grade with mostly A's and B's
> and a couple of C's.  So between – you don't develop a disability after third,
> fourth, fifth, sixth – four years of very good academic performance, and then in
> seventh grade all of a sudden, develop a disability.

Id. at 201-02, 207.  Friel further testified that although Richard underachieved in the seventh and

eighth grades, his teachers reported that he was still learning and acquiring concepts, as reflected

in his performance on tests, and that his declining grades were attributed to his attitude toward

school, his frequent absences, and his failure to complete homework.  Id. at 206-10.

The record reflects that the District provided supportive services to Richard in the areas

perceived as problematic, primarily homework completion.  For example, Linda Thacker,

Richard's eighth grade guidance counselor, described him as an "average" student with

difficulties completing homework.  She testified that in order to address his homework

completion problem, she began by setting up a biweekly progress report that would document

assignments that were completed and assignments that were not completed.  See Testimony of

Linda Thacker, May 15, 2006 Hearing, at 7-8.  Richard was then given an "agenda book" that his

teachers would be required to check.  At the same time, Richard's parents were called in for

conferences to address his needs.  Id.

Denise Fagan, director of special education, testified that Richard's grades reflected that

he was passing his classes and making educational progress, and therefore his performance did

not raise a "red flag."  See Testimony of Denise Fagan, May 15, 2006 Hearing, at 41.  When

asked about the District's awareness that Richard may be suffering from ADHD, Fagan testified

that "there are many, many students identified with ADD and ADHD who do not [qualify for special education] because they're functioning appropriately in school and they're learning." Id. at 43.   She further testified that lack of homework completion, which was perceived by Richard's teachers as being the primary cause of his declining grades, was a typical problem for middle school and high school students, and not in itself an eligibility criteria for special education.   In light of reports from teachers that Richard "was participating in class[,] performing in class, [and] passing tests," referral for special education was perceived as inappropriate at the time. Id.   Finally, Fagan testified that Richard's instructors worked as a team in designing strategies and techniques to assist him with homework completion, and while Richard was a student that "they needed to keep their eye on," their actions at the time were appropriate.   See id. at 47-48.

Richard's seventh and eighth grade teachers Diane Lachenmayer, Anthony Gabriel, and Carl Atkinson, consistently testified that Richard was able to learn and make educational progress in their classes, but that his grades suffered as a result of his failure to complete homework.   Lachenmayer, who taught seventh grade math, testified that Richard was attentive in her class and scored well on tests and quizzes, which reflected that he was learning. See Testimony of Diane Lachenmayer, April 17, 2006 Hearing, at 154-55.   She further stated that his grades would have been higher had he completed his homework, and that there was insufficient parental involvement in addressing his lack of homework completion. See id. at 127-28, 140, 153-54.

Similarly, Gabriel, who taught Richard eighth grade English, testified that he was an average student who could have performed better had he completed his assignments, but was

10

more interested in other activities, such as music.  <u>See</u> Testimony of Anthony Gabriel, April 17,

2006 Hearing, at 28-29, 36.  He further testified that, based on performance in his class, he did

not perceive Richard as being a child with a disability requiring special education.  <u>Id.</u> at 29, 54.

Atkinson, Richard's eighth grade social studies teacher, likewise testified that Richard was an

average student with low motivation and a problem with homework completion.  <u>See</u> Testimony

of Carl Atkinson, April 17, 2006 Hearing, at 67, 71-72.  Atkinson further testified that despite his

frequent absences and failure to complete homework, as the year progressed, Richard was able to

improve his grades and to make educational progress.  <u>See id.</u> at 83-84.

Upon review of the administrative record, the Court concurs with the Hearing Officer's

conclusion that Plaintiffs' assertion that Richard suffered from a learning disability in the seventh

and eighth grades lacks evidentiary support.  The District has offered the testimony of a number

of teachers and other educators who had the opportunity to observe Richard and his performance

both before, during, and after the seventh and eighth grades.  These witnesses offered

uncontradicted testimony that Richard was an average student who made meaningful educational

progress, but exhibited low motivation and a disinterest in academic work.  Richard's poor

attitude toward school was evidenced in his frequent absences and failure to complete homework

assignments, both of which significantly affected his grades.  The District also offered

uncontradicted testimony that Richard was attentive in class and performed well on tests,

exhibiting a pattern of learning.

The Appeals' Panel decision suggests that because an evaluation completed while

Richard was in the second grade reflected possible ADHD, he should have qualified for special

education in the seventh and eighth grades.  However, even a medical diagnosis of ADHD would

not automatically qualify a student for special education.  Throughout the third, fourth, fifth, and

sixth grades, Richard performed well academically and achieved high grades.  Although his

grades declined in the seventh and eighth grades, Richard's teachers observed continued

educational progress, and attributed his underachievement primarily to a lack of homework

completion.  In an effort to address this problem, his teachers assembled a team and devised

strategies to assist Richard.   In the absence of evidence that Richard was eligible for special

education as a student with a learning disability during the 1999-2001 period, the Court cannot

conclude that the District failed to timely identify Richard as a disabled child in need of special

education.  Accordingly, the Court will reverse the Appeals Panel's decision awarding

compensatory education to Plaintiffs for the 1999-2001 period, and affirm the decision of the

Hearing Officer denying relief.

> 2.    *The 2002-2004 School Years*

In May, July, and September 2004, the Hearing Officer held due process hearings to

address Plaintiffs' complaint that the District failed to provide Richard a FAPE in the 2002-2004

period while he was in high school.  The Hearing Officer concluded that the District did not

provide Richard a FAPE and awarded him five hours per day of compensatory education for each

school day from June 2002 to September 2004.  The Appeals Panel reversed, holding that the

Hearing Officer applied an incorrect legal standard in his analysis and made findings that were

unsupported by the evidence in the record.  See AP 2004, at 8-12.  The Court agrees that the

Hearing Officer erred, and will therefore affirm the decision of the Appeals Panel.

The Hearing Officer opined that the IEPs offered to Richard by the District were deficient

because "Richard has not made meaningful educational progress."  Hearing Officer's Decision,

October 8, 2004, at 24, 30.  As the Appeals Panel correctly noted, however, the Hearing Officer

improperly applied a retrospective analysis instead of evaluating the IEPs under the test set forth

in Board of Education v. Rowley, 458 U.S. 176, 206-07 (1982).  The two-part Rowley test

requires courts to inquire (1) whether the District complied with the procedures of the IDEA; and

(2) whether the IEPs were "reasonably calculated to enable the child to receive educational

benefits."  Id.  "Districts need not  provide the optimal level of services, or even a level that

would confer additional benefits, since the IEP required by IDEA represents only a basic floor of

opportunity."  Carlisle, 62 F.3d at 534 (citations omitted).  Moreover, "the measure and adequacy

of an IEP can only be determined as of the time it is offered to the student, and not at some later

date."  Fuhrmann on Behalf of Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d

Cir. 1993).  Accordingly, Richard's ultimate failure to make progress, viewed with the benefit of

hindsight, does not necessarily render the IEPs inadequate.  See Carlisle, 62 F.3d at 534.

A review of the administrative record reveals that the IEPs developed by the District to

address Richard's needs were indeed reasonably calculated to enable him to receive educational

benefits.   The January 2002 IEP incorporated the recommendations of the November 2001

CHOP report, which included a diagnosis of ADHD, Inattentive Subtype.  Gail Friel, the school

psychologist who participated in the development of the IEP, testified that, in an effort to assist

Richard with his difficulties in math reasoning, the IEP included a recommended placement in

Applied Algebra, a slower-paced math course.  See Testimony of Gail Friel, May 11, 2004

Hearing, at 66-67.  In order to assist Richard with homework completion and organizational

needs, the IEP recommended that assignments be recorded in an agenda book on a daily basis

and that parents and teachers check the book on a regular basis to ensure that assignments are

completed.  See id. at 67-70; see also January 17, 2002 IEP.   When asked whether she was concerned about the level of restrictiveness of the IEP, Friel testified that the most appropriate placement would have been a learning support classroom.  However, Richard displayed oppositional behavior and resistance to any form of special education.  As a result, Friel felt the plan offered a good start in order to enable Richard to begin participating in the program.  See Testimony of Gail Friel, May 11, 2004 Hearing, at 70-72.  Despite the District's efforts to design a program that would meet Richard's educational needs, he refused to accept any of the support services.  See Testimony of Angie Ganser, May 11, 2004 Hearing, at 224-25.

The March IEP meeting was convened because Richard was failing Algebra and two other courses.  Id. at 239.  The revised IEP recommended that Richard enroll in a modified math class, but both Richard and his mother asked that he not be required to attend learning support sessions and that he be permitted to remain in his Algebra class.  Id. at 241-42.  After Plaintiffs rejected the recommendations made by the District as part of the March 2002 IEP, a third IEP was developed in June 2002 to address the continuing decline in Richard's performance. Plaintiffs again rejected the District's recommendation that Richard be enrolled in a modified math class that would meet his needs, and requested that he be enrolled in the more advanced Geometry class.  Id. at 243-44.  The June IEP also recommended specially-designed instruction relating to improvement of organizational skills and homework completion and math skills. Plaintiffs rejected the June IEP, citing disapproval of Richard's schedule.  Id.; June 10, 2002 IEP.

A fourth IEP meeting was held in October 2002, while Richard was in the tenth grade. Ms. Friel, who participated in the meeting, testified that Richard was continuing to experience difficulties in school, continued to refuse supportive services, and displayed oppositional

behavior.  See Testimony of Gail Friel, May 11, 2004 Hearing, at 77-79.  The October IEP was

similar to the earlier IEPs in that it identified Richard's weaknesses in the areas of math

reasoning, organizational skills, and homework completion.  Although Richard continued to

insist that he would not take part in any special education program, the parents approved of the

recommendations, but requested that Richard be removed from the study skills class and placed

back into a regular study hall.  See Testimony of Angie Ganser, May 11, 2004 Hearing, at 248-

51.

    The next two IEP meetings were held in December 2002 and February 2003.  As part of

its recommendations, the District offered Richard a part-time learning support placement, as well

as specially-designed instruction to address his weak organizational and study skills.  However,

Plaintiffs refused all special education services, even at the least restrictive level.  See Testimony

of Gail Friel, May 11, 2004 Hearing, at 82-83.  During the February 2003 IEP meeting, the

District refused to agree to Plaintiffs' request that special education be discontinued, contending

that Richard was in need of more supportive services, not less.  See id.

    In the Fall of 2003, the District funded neuropsychological and psychiatric evaluations of

Richard.  The psychiatric evaluation, completed by Dr. Lisa Goldstein, confirmed the diagnosis

of ADHD, Inattentive Subtype, and identified patterns of oppositional behavior in Richard and

their effect on his performance:

> [Richard] demonstrated no ability to reflect, accept feedback or take other
> people's perspectives.  He could be minimally engaged in thinking of possible
> solutions but rejected them all out of hand.  He took no responsibility for his own
> actions, minimized his own failures and believed that he was a victim of other
> people's incompetence.  Even when talking about having "cursed out" the
> principal he stated, "he knows he deserves what he got."

See Psychiatric Report of Lisa Goldstein, M.D. ("Goldstein Report") at 4.  The Goldstein Report

further stated that "the real dilemma at this time is how to engage this 17½ year old in developing

an education and therapeutic program which he will even attempt ... it is very difficult to 'help'

someone against their will no matter how desperately they need it." Id. at 7.  Dr. Goldstein

recommended that Richard be identified as an Emotionally Disturbed Special Education Student

with a secondary identification as a student with a learning disability in mathematics.  She

suggested placement in a therapeutic boarding school with a strong music program, while

recognizing that his resistance to any intervention or treatment was the primary component of his

disability.  Finally, she strongly recommended family and individual therapy, along with

medication for treatment of ADHD. Id. at 8-9.

     The two final IEPs were developed in February and April 2004, after the Goldstein

Report had been received and reviewed.  Patricia Mueller, supervisor of special education,

drafted the February 2004 IEP and attended the meeting, along with Plaintiffs.  See Testimony of

Patricia Mueller, July 12, 2004 Hearing, at 560-61.  Mueller testified that she carefully

considered and attempted to incorporate Dr. Goldstein's findings and recommendations into the

February 2004 IEP.  See id.  The Notice of Recommended Educational Placement proposed a

specific plan, including special education services; participation in an alternative school program

outside of the regular high school for counseling; academic support and independent study;

attendance in regular education classes for three 45-minute periods per day; and placement in a

learning support classroom for one 45-minute period per day.  See Notice of Recommended

Educational Placement, Feb. 17, 2004, at 1.  Mueller testified that although it was critical to the

success of the educational program that Plaintiffs seek concurrent family and individual therapy

as recommended by Dr. Goldstein, Plaintiffs never followed through with family therapy or psychiatric treatment.  See Testimony of Patricia Mueller, July 12, 2004 Hearing, at 567-68. Mueller testified that in all her years developing IEPs, "this is the most individualized program that [she] has ever been involved with."  Id. at 587.  Although Plaintiffs approved of the IEP, Richard continued to resist the services offered by the District and was frequently absent. Mueller described Richard's attitude as an ongoing obstacle to the provision of special education services:

> [T]his was an ongoing situation that occurred ... [Plaintiffs] would meet with the team. There is a plan that's worked out.  Everyone thinks it's a good plan.  It seems to be agreed upon.  And then Rich indicates to his Parents that he's not going to do that, doesn't want to do that, whatever.  And then the Parents back off.  That's what brings us to a Due Process Hearing.

Id. at 590-91.

Mueller led the final April 2004 IEP meeting, which was attended by Plaintiffs, including Richard.  A representative from the counseling program to which Richard was referred as part of the February 2004 IEP also attended, and reported that Richard refused to work on the goals developed in the IEP.  See id. at 602-03.  Mueller testified that Richard's needs, as well as the goals and objectives contained in the February 2004 IEP, remained the same in the April 2004 IEP.  The District proposed a number of modifications, including a full-time emotional support placement and a change to the independent study program.  See id. at 611.  However, Plaintiffs did not respond to the Notice of Recommended Educational Placement.  Id. at 613.

As the Appeals Panel correctly observed, the record reflects that the District made consistent efforts to devise a special education program that would meet Richard's needs.  Each

17

of the eight IEPs was developed by a team of educational professionals with the participation of Richard's teachers.  The IEPs offered programming designed to assist Richard in tackling problems including lack of homework completion, weak organizational skills, and difficulty with math reasoning.  Moreover, the District spent a great deal of time reviewing and revising the IEPs to ensure that they evolved along with Richard's increasing needs.

While in high school, the programming offered to Richard became more restrictive.  However, Richard became increasingly oppositional and resistant, refusing to engage in the programming designed for him by the District.  As Ms. Friel, Ms. Ganser, Ms. Mueller, and Dr. Goldstein all stated, Richard's attitude, along with his refusal to engage in mental health treatment and to take his prescribed medications, was the ultimate factor contributing to his inability to make satisfactory educational progress.  The situation was exacerbated by Plaintiffs' tendency to acquiesce to Richard's demands and their failure to adhere to the recommendations contained both in the 2001 CHOP report, as well as Dr. Goldstein's 2003 psychiatric evaluation, both of which urged Plaintiffs to enroll Richard in therapy.  Most tellingly, on occasions when it was evident that Richard was in need of assistance, Plaintiffs demanded either that special education services be reduced or altogether discontinued.

The Court concurs with the Appeals Panel's conclusion that the Hearing Officer applied the incorrect legal standard in addressing the appropriateness of the IEPs and failed to take into account the testimony of multiple witnesses whom he found to be credible but whose opinions he proceeded to disregard.  Indeed, the District has presented credible, uncontradicted evidence demonstrating that it offered Richard a FAPE throughout the 2002-2004 period, and that the IEPs were reasonably calculated to enable Richard to receive an educational benefit.  Unfortunately,

Richard's consistent refusal to engage in the services provided to him constituted an insurmountable obstacle to the successful implementation of the District's programs. Accordingly, the Court will affirm the Appeals Panel's decision denying Plaintiffs compensatory education for the 2002- 2004 period.

### B.    CLAIMS UNDER § 1983 AND § 504

#### 1.    *Section 1983 Claim*

The District has moved for summary judgment on Plaintiffs' Section 1983 Claim, arguing that the claim is not legally viable.  In a recent case, A.W. v. Jersey City Public Schs., 486 F.3d 791 (3d Cir. 2007), the Third Circuit expressly held that a Section 1983 action is not available to remedy violations of the rights created by the IDEA or Section 504 of the Rehabilitation Act. Accordingly, because the District is entitled to judgment as a matter of law, Plaintiffs' Section 1983 claim will be dismissed.  See Ronald E. v. Sch. Dist. of Phila. Bd. of Educ., 2007 WL 4225584, at *6 (E.D. Pa. Nov. 29, 2007) (holding that parents did not have standing to sue under § 1983 to enforce the rights secured by IDEA and Section 504); Travis G. v. New Hope-Solebury Sch. Dist., 544 F. Supp. 2d 435, 445 (E.D. Pa. 2008).

#### 2.    *Section 504 Claim*

The District also seeks summary judgment on Plaintiffs' Section 504 claim.  Section 504 of the Rehabilitation Act of 1973 prohibits federally funded entities from denying a free appropriate public education on the basis of disability.  See Melissa S. v. Sch. Dist. of Pittsburgh,

183 Fed. Appx. 184, 189 (3d Cir. 2006).[1]  "The regulations implementing § 504 adopt the IDEA language, requiring that schools which receive or benefit from federal financial assistance shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction."  Damian J. v. Sch. Dist. of Phila., 2008 WL 191176, at *2 (E.D. Pa. Jan. 22, 2008) (citations omitted).  "There are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition."  Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999) (citations omitted).

In order to establish a violation of § 504 of the Rehabilitation Act, a plaintiff must prove that (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.  Ridgewood, 172 F.3d at 253.  In this case, Plaintiffs' § 504 claim relies "on the same core of operative facts" as their IDEA claim.  Plaintiffs have failed to show that Richard was denied benefits or was subject to discrimination on the basis of his disability.  To the contrary, the administrative record reflects that the District offered Richard an appropriate education tailored to his evolving needs.  Accordingly, summary judgment will be entered in the District's favor with regard to Plaintiffs' Section 504 claim.  See Melissa S., 183 Fed. Appx. at 189 (affirming the grant of summary judgment on a Section 504 claim "because

---

[1]     The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...."  29 U.S.C. § 794(a).

the allegations underlying the Rehabilitation Act claim do not differ substantively from those underlying the IDEA claim"); <u>Derek B. ex rel. Lester B. v. Donegal Sch. Dist.</u>, 2007 WL 136670, at *13 (E.D. Pa. Jan. 12, 2007).

## VI.    CONCLUSION

Upon review of the record, the Court concludes that Richard was not eligible for special education during the 1999-2001 period, and that the District provided Richard a FAPE during the 2002-2004 period.  The Court therefore will reverse the Appeals Panel's decision awarding compensatory education to Plaintiffs for the 1999-2001 period, and affirm its decision denying relief for the 2002-2004 period.  The District's Motion for Judgment on the Administrative Record and for Summary Judgment will be granted.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


S., <u>et al.</u>                                        :
                                                        :          **CIVIL ACTION**
     v.                                                 :          **NO. 05-1284**
                                                        :
**THE WISSAHICKON SCHOOL**                              :
**DISTRICT**                                            :


<u>**ORDER**</u>

**AND NOW**, this      24th            day of July, 2008, upon consideration of Plaintiffs'

Motion for Partial Judgment on the Administrative Record (docket no. 20), Defendant' Motion

for Judgment on the Administrative Record and for Summary Judgment (docket no. 21), and all

responses thereto, and for the reasons stated in the accompanying Memorandum, it is

**ORDERED** that Defendant's Motion is **GRANTED** and Plaintiffs' Motion is **DENIED**.  It is

**FURTHER ORDERED** that the Clerk of the Court shall mark this case **CLOSED**.


                                        **BY THE COURT:**


                                        **/s/ Bruce W. Kauffman_____**
                                        **BRUCE W. KAUFFMAN, J.**